**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**In Admiralty**

**NORFOLK DREDGING COMPANY,**

Plaintiff,

v. Civil Action No.

**UNITED STATES OF AMERICA,** through
the DEPARTMENT OF THE NAVY,
Mid-Atlantic Naval Facilities
Engineering Systems Command,

Defendant.

## COMPLAINT

Norfolk Dredging Company ("Norfolk Dredging"), by counsel, for its Complaint against the United States of America, acting through the Department of the Navy, Mid-Atlantic Naval Facilities Engineering Systems Command (the "Defendant" or "Navy"), states as follows:

## INTRODUCTION

1. This case arises out of a maritime dredging contract between Norfolk Dredging and the Navy (the "Contract"). The Contract required Norfolk Dredging to perform maintenance dredging at the Navy's Lambert's Point Deperming Facility (the "Deperming Facility"). The Deperming Facility provides magnetic-silencing services to protect Navy ships from magnetically detonated mines and avoid enemy detection.

2. During the dredging work, Norfolk Dredging's subcontractor, Cottrell Contracting Corporation ("Cottrell"), severed several "Z-loop" cables while dredging the side slopes of the dredge prism. In 2009, the United States Army Corps of Engineers ("COE") had issued a permit authorizing installation of the cables at a depth of 56.3 feet (well under the riverbed) with a

covering of 7 feet of protective gravel backfill in a "deep trench" that extended to the Northwest Cable Support Platform (the "Platform").

3. After the system was installed in 2010, however, a survey for the Navy indicated that the cables were not installed in accordance with the "as-built" design or the COE Permit. In fact, the cables were at or above the riverbed for 25-28 feet east of the Platform, where they entered the bottom at a "shallow angle" at a depth of about 41 feet. The cables were later discovered severed at about 47 feet deep, in the area where they should have been 56.3 feet deep.

4. When the Navy developed specifications for dredging the deep trench area in 2020, it did not disclose that its previous survey indicated that the cables were at a shallow depth in or immediately adjacent to the dredged slope. Far from it: the Navy's specifications stated that the "top of gravel backfill exists at approx. -50.3 ft." This was false. Based on the 2010 survey, the Navy knew it was false.

5. The Navy also knew that dredging along the top of the side slope was an inexact process. The Specifications acknowledged "unavoidable inaccuracies of dredging processes" and stated that when dredging the side slopes to the specified grade the contractor should follow the designated lines and contours as closely as "practicable." The Specifications prohibited use of anchors and spuds in the deep trench, which substantially limited the dredge's positive control over lateral movement while dredging, thus limiting the dredge's "practicable" level of precision in dredging the slope.

6. Recognizing that overdredging was unavoidable, the Contract provided compensation for material excavated 1-foot beyond the designated dredge prism, but noted that the Contractor was otherwise responsible for usual and customary conditions of a maintenance dredging contract. Some overdredging of the slope is customary in the dredging industry as a

means to assure the proper slope after side material sloughs into the dredged area, even though the contractor is not compensated for overdredge material beyond the 1-foot threshold.

7. It is impossible to know whether the cables were severed within the dredge prism, beyond the top of slope but within the 1-foot of extra "pay-dirt," or farther out from the top of the slope. Post-casualty underwater surveys located loose and severed cable strands about 50 feet east of the Platform, but no one knows where those severed ends were when the cables were under tension from the weight of the gravel in the trench.

8. In its denial of Norfolk Dredging's certified claim, the Navy indicated that Norfolk Dredging's subcontractor was dredging "10-12' beyond the approved side slope of the dredge area when it encountered the Z-loop cables." Therefore, according to the Navy, the Navy had expensive, sensitive, and unprotected Z-loop cables (important to National Security) at 47 feet deep, just 10 feet from the edge of the dredged slope, *but it did not disclose this fact to Norfolk Dredging*. This is a razor thin margin, especially in view of the Navy's recognition of "unavoidable inaccuracies of dredging processes."

9. Under the terms of the Contract, after the damage Norfolk Dredging was required to follow the Contracting Officer's direction to replace the Z-loop cables subject to reserved claims. Norfolk Dredging reserved and did not waive its claim for compensation for replacing the cables. It first submitted a Request for Equitable Adjustment, which the Navy denied. Norfolk Dredging then submitted a Certified Claim, which the Navy also denied. The claim amount was $4,845,322.19. In the alternative, Norfolk Dredging sought an award for betterment because, at the Navy's direction, it provided new cables to replace 50% depreciated cables and a new and improved installation system. Norfolk Dredging's betterment claim was $2,422,660.15.

10. This Complaint includes five counts: (1) Count I to formalize appeal of the contracting officer's final decision denying Norfolk Dredging's September 25, 2025 Certified

Claim; (2) Count II for the Navy's breach of its duties by failing to disclose facts vital to the safe and successful performance of the work where the Navy had superior knowledge; (3) Count III for the Navy's breach of the Contract by misrepresenting the location of the cables; (4) Count IV for the Navy's breach of its implied warranty of adequate specifications; and (5) Count V for the Navy's betterment in receiving new Z-loop cables in place of depreciated cables.

**PARTIES**

11. Norfolk Dredging is a Virginia Corporation with its principal place of business in Chesapeake, Virgina.

12. The Defendant is the United States of America, acting through the Department of the Navy, Mid-Atlantic Naval Facilities Engineering Systems Command.

**JURISDICTION AND VENUE**

13. This case falls within the Court's admiralty jurisdiction under 28 U.S.C. § 1333 and is designated as such under Federal Rule of Civil Procedure 9(h) because Norfolk Dredging seeks recovery from the United States of America for breach of a maritime dredging contract. This Court also has subject matter jurisdiction under the Contract Disputes Act, 28 U.S.C. § 1331.

14. Norfolk Dredging has timely and properly complied with the requirements of the Contract Disputes Act, 41 U.S.C. §§ 7101 *et seq*. prior to filing this lawsuit.

15. Venue in this Court is proper under 29 U.S.C. § 1391 (e)(1) because a substantial portion of the events or omissions giving rise to the claim occurred within this district. Further, this action is governed by the Suits in Admiralty Act, which mandates that "[a] civil action under this chapter shall be brought in the district court of the United States for the district in which . . . any plaintiff resides or has its principal place of business. . . ." 46 U.S.C. § 30906 (a).

## FACTUAL BACKGROUND

*Deperming and Relevant Prior Work at the Facility*

16. Steel hulled ships generate magnetic fields that change over time. The variation in the field strength along a hull is known as the ship's magnetic signature. This signature can be detected by remote sensing equipment, such as seaborne mines, to target vessels. To reduce susceptibility and, thus, increase the survivability of Navy ships from mine threats, the Navy deperms its ships and calibrates the onboard degaussing system at a Magnetic Silencing Facility.

17. Deperming is the magnetic treatment of the surface of the ship's hull to reduce permanent magnetization and is conducted at specifically designed piers. The Navy maintains a deperming pier and Magnetic Treatment Facility at the Lambert's Point Deperming Station in the Elizabeth River. Passive magnetic sensors suspended inside fiberglass tubes are imbedded in the river bottom under two berthing slips at approximately -52.2 feet or roughly 4 feet below the riverbed. Z-loop cables installed in a deep trench near the slips produce a vertical magnetic field aligned with the Earth's magnetic axis to help reduce or eliminate a vessel's magnetic signature.

18. On November 6, 2008, the Navy issued Solicitation No. N40085-09-C-4201 for Phase II of its Lambert's Point Deperming Facilities Upgrade. This Solicitation covered work for dredging trenches and installing the Z-loop conduit and cables.

19. On September 2, 2009, the COE issued to the Navy Region Mid-Atlantic a permit authorizing the Navy to conduct "repair work on existing Deperming Station cable loop systems and perform new dredging to install cables" (the " 2009 Permit").

20. The 2009 Permit allowed a combination of "shallow trench dredging and deep trench dredging," including the removal of 37,290 cubic yards of material and placement of 10,500 cubic yards of non-magnetic gravel as backfill in the dredged areas. The 2009 Permit further

authorized the Navy "to dredge to the permitted depth of -56.3 ft. at mean low water, per the enclosed drawings." A copy of the 2009 Permit is attached as **Exhibit 1**.

21. The enclosed drawings included the following specifications for the deep trench (highlight added):




22. As indicated, cables were authorized to be placed at a depth of 56.3 feet and the top of the gravel backfill was 49.3 feet deep. The 2009 Permit excerpt below shows the position of the deep trench and cable location authorized by the 2009 Permit (highlights added). According to this approved design, the cables extended all the way to the Platform at a depth of 56.3 feet.



23. The 2009 Permit did not authorize the Navy to lay the cables on or over the riverbed, and cables laid at or near the riverbed would be an illegal obstruction to navigation.

24. Under the terms of the 2009 Permit, the Navy was required, within 60 days of completion of the work, to "provide the Corps with an as-built drawing of the new construction" certified by an engineer or surveyor. The "as-built detail shall . . . show[] the . . . layout of the cable as it is positioned within the Horizontal and Vertical limits of the federal Navigation Channel." The Navy was also required to submit a "compliance certificate" certifying "that the work authorized by the [2009 Permit] has been completed in accordance with [the 2009 Permit]."

25. On May 5, 2010, during the installation of cables authorized by the 2009 Permit, the contractor performing the work, W.F. Magann Corporation, notified the Navy in writing that the gravel backfill appeared to be "sinking" and suggested that "placing additional stone to reach contract elevation may put additional pressure and/or tension in the Z-loop cables."

26. In its May 10, 2010 written response, the Navy recommended "not placing any additional gravel in the deep Z-loop trenches," except for the "transition from the 20-inch conduit [at the Platform] to deep trench." A copy of the Magann notice and Navy's response is attached as **Exhibit 2**. Because the cables were sinking, they did not remain at 56.3 feet. As they sank into the deep trench, their over-depth in the trench naturally pulled the cables to a shallower depth closer to their terminus at the Platform.

27. After the Z-loop system's installation was complete, Collins Engineering performed an underwater survey for the Navy. This survey confirmed that the cables were not at their authorized depth. The Collins Engineering survey showed that at the Platform "the cables were observed to be pulled tight against the edge of the [Platform] with minimal bending radius." Further, the survey showed that the cables entered the gravel backfill approximately 25 to 28 feet

east of the [Platform] at a depth of 41 feet and that the cables entered the bottom "at a shallow angle." This confirms that, as of 2010, the cables were laying uncovered on or over the riverbed in violation of the 2009 Permit. This information also confirmed W.F. Magann's warning that the weight of the gravel was causing the cables to sink in the deep trench and put "additional tension/pressure" on the cables.

*The Norfolk Dredging Contract*

28. On June 4, 2020, Norfolk Dredging entered a dredging contract (Contract # N4008520C0030) for maintenance dredging at the Norfolk Naval Base. A copy is attached as **Exhibit 3**. On September 16, 2021, the Navy issued contract modification P00004 for maintenance dredging of the deperming station in Norfolk Harbor (the "Mod"). The Mod is attached as **Exhibit 4.** The Specifications for the Mod (dated June 25, 2021) are attached as **Exhibit 5.** The Plan and Detail Sheets for the Mod (V-001, V-002, V-101& V-102) are attached as **Exhibit 6**. The base Contract, Specifications, Plan and Detail Sheets, and Mod (Exhibits 3-6) are referred to collectively as the "Contract."

29. On October 4, 2021, Norfolk Dredging subcontracted the deperming station work described in the Mod to Cottrell (the "Subcontract").

30. The Mod required maintenance dredging at the Deperming Station with a base bid of 82,402 cubic yards ("CY"). This amount was comprised of 61,424 CY at the minimum contract depth and 20,978 CY for compensated overdredge material to account for what the contract language called "unavoidable inaccuracies of dredging processes." **Exhibit 4** at Sec. 35 20 23, §1.6. Mod 4 Plan drawing V-101 (Exhibit 6, excerpted below) showed a dredged depth of 49 feet in the deep trench with a "maximum overdredge depth of 50FT MLLW."




31. As indicated, the Plan cautioned that "top of gravel backfill exists at approx. -50.3FT MLLW." This representation was false. The cables were deeper in the trench and shallower closer to the Platform.

32. The red line on drawing V-101 above was labeled "Dredge Limits." This line depicts the "Toe Slope" as shown on Plan drawing V-002 below:




33. As indicated on drawing V-002, the contractor was required to dredge a slope beyond the "toe" or "Dredge Limit." The required slope ratio was 2 horizontal feet for every 1

vertical foot. The Dredging Plan included sounding data showing pre-dredging depths of 45-46 feet along the toe with a "required project depth of -49ft MLLW with an overdredge depth of -50ft MLLW." If the dredged depth at the Toe was 50 feet and the adjacent shoal area was 45 feet, then applying the slope criteria places the top of the slope approximately 10 feet beyond the "toe" indicated on the Plan.

34. The Contract did not precisely define any fixed dredge limit along the slope. The Contract stated that "[d]redging on side slopes shall follow, as closely as practicable, the lines indicated or specified" and that a "1 foot allowance will be made for dredging beyond the indicated or specified side slopes." **Exhibit 5** at Sec. 35 20 23, § 1.7. Further, the Dredging Plan indicated that "[d]redge limits shown are approximations based on estimated siltation." **Exhibit 6** at V-002. The dredge limit specified was therefore imprecise, as it depended on "estimated siltation" and a slope calculation that varied based on depth contours that the contractor was required to follow "as closely as practicable". *Id.*; **Exhibit 5** at Sec. 35 20 23, § 1.7.

35. Although the Contract required compensation for no more than 20,978 CY of overdredge material, no contract terms prohibited the contractor from removing additional material beyond the slope, provided the dredge followed depth contours as closely as practicable.

36. The Dredging Plan provided that "[n]o anchors or spuds shall be used within the deperming slip and within channel in close proximity of the Z-loop trench as shown on the plan." **Exhibit 6** at V-101, 102. Anchors and spuds are necessary to maintain precise control of the horizontal movement of the dredge when excavating. Without anchors and spuds, small tender vessels are required to swing the dredge laterally, thus substantially decreasing "practicable" control of horizontal dredging (as opposed to depth control). These terms would not have posed an unreasonable risk of damage to the cables had the cables been at the depth indicated in the Contract specifications and 2009 Permit.

37. When maintenance dredging a slope, material on the edge of a freshly dredged slope is prone to collapse into the void created by the dredging operation. To account for this common occurrence and to ensure the specified slope is maintained after settlement and material migration, dredgers often overdredge the top of the slope. This is a standard and widely accepted practice within the dredging industry. If subsurface infrastructure (*e.g.* cables) is located immediately adjacent to the edge of the top of the required slope, however, contract documents must be modified to alter the slope requirement and create a safety buffer.

38. The Contract included three clauses that addressed property damage caused by dredging operations, which made it essential for the Navy to disclose the correct location of any property (like the Z-loop cables). First, Section 3.2.10 required the contractor to "repair" any damage to structures "lying on or adjacent to the site of the work, insofar as "caused by variation in locations or depth of dredging, or both, from that indicated or permitted under the contract." Second, the Contract incorporated FAR § 52.236-9, which requires the contractor to "preserve and protect" structures "adjacent to the work site" and "existing improvements and utilities ... near the work site ... the locations of which are made known to or should be known by the Contractor" and to "repair any damage to those facilities." Finally, the Contract incorporated FAR § 52.236-7, which provides that the "Contractor shall also be responsible for all damages to ... property that occur as a result of the Contractor's fault or negligence."

*Dredging Work Commenced*

39. On December 21, 2021, the COE issued to the Navy a permit for maintenance dredging at the Deperming Station (the "2021 Permit"). A copy of the 2021 Permit is attached as **Exhibit 7**. Dredging was authorized to a maximum depth of 51 feet. The project was described in the 2021 Permit with attached drawings that showed the deep trench with cables at 56.3 feet running from the channel to the Platform.

40. The Navy conducted a pre-construction conference on January 26, 2022. In attendance were representatives for the Navy, Norfolk Dredging, and Cottrell. At the conference, the Navy's Construction Manager, Phil Rinehart, emphasized that Cottrell was not to "extend work beyond limits of dredging" and that Cottrell could not use anchors or spuds in the deperming slip because "conduits running through the deperming slip ... could be at risk." The meeting minutes indicate that there was "extended discussion about dredge limits and existing infrastructure" and that "existing cable locations are approximate." "Contractor was reminded of maximum allowable depths" and that it "may stop reasonably short of gravel fills."

41. Even though the Navy was specifically addressing the location of the cables and potential risk to infrastructure, it did not notify Norfolk Dredging or Cottrell that on last report the cables had been displaced from design depths and were entering the gravel 28 feet east of the platform at a depth of 41 feet at a shallow angle. This information indicated a significant risk that the cables were lying on or near the riverbed at or near the edge of the slope.

42. Had the Navy disclosed what it knew about the displaced cables, Norfolk Dredging and Cottrell would have insisted that the Navy modify the contract documents to adjust the dredge prism, create exclusion areas, or designate buffer zones. Alternatively, they could have asked to allow for the use of anchors and spuds for horizontal precision. If the Navy declined any of the above requests, Norfolk Dredging and Cottrell could and would have declined to perform dredging along the slope in the vicinity of the displaced cables.

43. On or about February 28, 2022, while performing the Subcontract, Cottrell's dredge severed the Z-loop cables. The Navy has claimed that the cables were severed 10 to 12 feet beyond the top of the required side slope. This distance falls within the range of overdredging that could reasonably result from dredging the required side slope as closely as "practicable" without the use

of anchors and spuds. The depth at that location was approximately 47 feet, which is almost 10 feet shallower than the cable depth permitted by the COE and represented in the Contract.

*Replacement of the Severed Cables*

44. By contract modification dated March 9, 2022, the Navy directed Norfolk Dredging to "restore the Deperming Station to full operating capability as soon as possible." On March 18, 2022, Norfolk Dredging directed Cottrell to commence and complete the work described in NAVFAC's March 9, 2022 letter. Cottrell responded by letter on March 29, 2022 indicating that it regarded Norfolk Dredging's letter as a change order and stating its intent to submit a Request for Equitable Adjustment of price and time of completion terms. The same day, Norfolk Dredging wrote a letter to the Contracting Officer "to preserve [its] rights with respect to conditions that . . . warrant a change or equitable adjustment to the Contract time and price." On March 31, 2022, the contracting officer sought clarification of Norfolk Dredging's position. On April 6, 2022, Norfolk Dredging confirmed that it reserved the right, after further investigation, to consider the repairs to constitute a constructive change or grounds for equitable adjustment to the Contract.

45. Cottrell completed the cable replacement project. The total burdened costs of the investigation and repairs was $4,845,322, consisting of at least $4,213,323 in costs incurred by Cottrell, plus $631,999 for Norfolk Dredging's reasonable 15% markup for overhead and profit.

46. In July 2024, Norfolk Dredging submitted a Request for Equitable Adjustment ("REA") to the Navy. The Navy denied the REA seven months later on February 24, 2025. Norfolk Dredging submitted its Certified Claim to the Navy on September 25, 2025. The Navy denied the Certified Claim five months later on February 25, 2026. Neither denial fully acknowledged or responded to the asserted basis of Norfolk Dredging's claims.

**COUNT I**
**DISPUTE UNDER THE CONTRACT – APPEAL OF THE FINAL DECISION**

47. Norfolk Dredging re-alleges the foregoing allegations as if fully set forth herein.

48. Norfolk Dredging fully and properly completed the work required under the Contract and complied with all prerequisites for the filing of this action.

49. Under the terms of the Contract and applicable law, the Navy wrongfully denied Norfolk Dredging's Certified Claim. By this action, Norfolk Dredging appeals the Contracting Officer's Final Decision denying the Certified Claim.

50. For the reasons set forth elsewhere herein, Norfolk Dredging seeks a *de novo* determination by this Court that Norfolk Dredging is entitled to judgment sufficient to compensate it for the costs to replace the Z-loop cables, including materials and labor, or alternatively, if that amount is denied for any reason, the value of the betterment to the Navy of the additional service life and more efficient design of the new cables.

**COUNT II**
**BREACH OF CONTRACT (NAVY'S FAILURE TO DISCLOSE ITS SUPERIOR KNOWLEDGE OF FACTS VITAL TO CONTRACT PERFORMANCE)**

51. Norfolk Dredging re-alleges the foregoing allegations as if fully set forth herein.

52. Norfolk Dredging contracted to perform maintenance dredging of the deep trench to a depth of -49 feet. The Contract Specifications cautioned that the top of the gravel backfill was located at approximately -50.3 feet, indicating that the Z-loop cables were located at approximately -56.3 feet and protected by 6 feet of gravel backfill (consistent with the 2009 Permit).

53. Under the Contract and applicable law, the Navy had a duty to Norfolk Dredging to disclose superior knowledge of facts vital to contract performance.

54. The Navy knew that between the deep trench and the Platform the Z-loop cables were at a shallower depth and not covered with protective backfill. Specifically, the Navy knew

that the Z-loop cables were within or adjacent to the designated slope at a depth shallower than -50.3 feet.

55. The location of the Z-loop cables within or adjacent to the designated slope was vital to the performance of the Contract because: (1) the Contract made Norfolk Dredging responsible for damage to cables located near the dredged area; (2) the Contract recognized that the "inaccuracies of dredging processes" were "unavoidable"; (3) the Navy's prohibition against the use of anchors or spuds while dredging the slope expanded the "practicable" reach of the dredging operation; and (4) some overdredging was standard practice to achieve the required slope.

56. Neither Norfolk Dredging nor Cottrell knew or had reason to know that the Z-loop cables were laid without gravel backfill at a depth of about -47 feet either within or immediately adjacent to the slope. Furthermore, the Navy had no reason to believe that Norfolk Dredging or Cottrell was aware that the Z-loop cables were near the riverbed within or near the slope. In fact, the 2009 Permit reported the cables were 56.3 feet deep.

57. The Navy breached the Contract and its duty to disclose superior knowledge by failing to disclose information vital to the performance of the Contract.

58. Had Norfolk Dredging known the approximate position of the Z-loop cables, it would have sought a modification to the Contract Specifications to adjust the dredge prism, create exclusion areas, or designate buffer zones to prevent damage to the cables. Alternatively, if the Navy declined to modify the specifications, Norfolk Dredging would have declined dredging the slope in the vicinity of the cables.

59. The Navy's breach by failing to disclose information vital to the performance of the Contract was a direct cause of the damage to the cables.

60. The Navy's breach caused damages to Norfolk Dredging as set forth herein.

## COUNT III
## BREACH OF CONTRACT (MISREPRESENTATION)

61. Norfolk Dredging re-alleges the foregoing allegations as if fully set forth herein.

62. The Contract Specifications falsely represented that the "top of gravel backfill exists at approx. 50.3 ft." In fact, the Navy knew that the top of the gravel backfill in the deep trench was below -50.3 feet and that the cables were located at or near the riverbed, without any gravel cover within or immediately adjacent to the top of the dredged slope.

63. The Z-loop cables were a "subsurface or latent physical condition[] at the site which differ[ed] materially from those indicated in [the Contract Specifications]" and they violated FAR § 52.236-2 (a)(1). Norfolk Dredging had no opportunity to provide written notice to the Navy of the hazardous location before Cottrell's dredging work because neither Norfolk Dredging nor Cottrell knew that the cables were shallower than specified.

64. The Navy's misrepresentation was material because it directly caused the damage to the Z-loop cables and the resulting costs that Norfolk Dredging incurred to replace them. Norfolk Dredging justifiably relied on the Navy's representations and the Contract Specifications because it had no way of knowing that the representations and specifications were false. Neither an inspection of the site nor a review of the 2009 Permit would have revealed the precarious location of the cables along the riverbed within or immediately adjacent to the dredged slope. Furthermore, Norfolk Dredging was legally entitled to rely on the Navy's specifications.

65. The Navy breached the Contract by misrepresenting vital information to the performance of the Contract.

66. The Navy's misrepresentation of such vital information to the performance of the Contract was a direct cause of the damage of the cables.

67. The Navy's breach caused damages to Norfolk Dredging as set forth herein.

**COUNT IV**
**BREACH OF WARRANTY (DEFECTIVE SPECIFICATIONS)**

68. Norfolk Dredging re-alleges the foregoing allegations as if fully set forth herein.

69. The Navy impliedly warranted the adequacy and accuracy of the Contract Specifications.

70. The Contract Specifications were defective and breached the implied warranty of adequate specifications because they required Norfolk Dredging to dredge of the top of the slope without anchors or spuds in close proximity to undisclosed Z-loop cables, thereby creating an extraordinary risk that the dredge operation would damage the cables. The defect was amplified by the Navy's false statement in its specifications that the top of the gravel backfill was at -50.3 feet, indicating that the cables were well below the dredging limits.

71. The Navy's breach of its warranty to provide adequate and accurate contract specifications was a direct cause of the damage to the Z-loop cables.

72. The Navy's breach caused damages to Norfolk Dredging as set forth herein.

**COUNT V**
**BETTERMENT / UNJUST ENRICHMENT**

73. Norfolk Dredging re-alleges the foregoing allegations as if fully set forth herein.

74. Norfolk Dredging alleges this betterment count in the alternative to its breach of contract and warranty counts above.

75. Norfolk Dredging, by and through its own work and the work of others on its behalf, provided and installed new Z-loop cables to replace the Navy's old cables. Upon information and belief, the old cables were approximately 50% through their useful lifespan at the time of the replacement.

76. The new Z-loop cables conferred a direct, substantial, and measurable benefit upon the Navy. The value of the new cables and their installation substantially exceeded the losses

incurred by the Navy as a result of the damage to the old cables, leaving the Navy in a markedly improved position.

77. Norfolk Dredging also provided a substantially improved and engineered Z-loop system that secured the cables within the deep trench without the necessity of loading tons of gravel on the cables.

78. This new system eliminated the problems caused by heavy gravel, which pushed the cables deeper into the trench bottom and pulled them tight and shallow at the platform. It also provides a less expensive method of replacing the cables when needed in 20 years.

79. The Navy knew of the new cables and the improved engineered Z-loop system, approved and accepted the improved system, and received the benefit of its installation.

80. The Navy has retained and continues to retain the benefit of the new Z-loop cables and the improved engineered Z-loop system without paying for its improved position.

81. Norfolk Dredging delivered value to the Navy in excess of $2,106,660 through the provision and installation of the new Z-loop cables and the improved Z-loop system.

82. To the extent the Court denies Norfolk Dredging's breach of contract or warranty claims for any reason, it would be inequitable for the Navy to retain the benefits of Norfolk Dredging's improvements or betterments without paying Norfolk Dredging for the value received.

**PRAYER FOR RELIEF**

WHEREFORE, Norfolk Dredging Company asks the Court to award it judgment against the United States of America for (1) at least $4,845,322 on Counts I-IV, plus prejudgment and post-judgment interest in accordance with 41 U.S.C. § 7109; or (2) in the alternative, at least $2,422,660 on Count V, plus prejudgment and post-judgment interest; and (3) all other just relief.

Dated: October 23, 2026

NORFOLK DREDGING COMPANY

*/s/ W. Ryan Snow*

W. Ryan Snow, VSB No. 47423
R. Paul DeRosa, VSB No. 100392
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
rpderosa@cwm-law.com

*and*

John E. Holloway, VSB No. 28145
Patrick H. O'Donnell, VSB No. 29637
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, Virginia 23510
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
John.holloway@kaufcan.com
Patrick.odonnell@kaufcan.com
*Counsel for Norfolk Dredging Company*